**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

File Name: 17a0371n.06

**Case Nos. 16-1774/1775**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

Jun 26, 2017
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| ROSCOE BENTON, III and | ) | |
| DESI NAJUANA BENTON, | ) | O P I N I O N |
| | ) | |
| Defendants-Appellants. | ) | |

**BEFORE: SILER, CLAY and McKEAGUE, Circuit Judges.**

**McKEAGUE, Circuit Judge.** Defendants Roscoe Benton, III, and his wife Desi Najuana Benton stood trial in November 2014 on charges of bankruptcy fraud and mail fraud. Each was found guilty of some but not all of the charged offenses. Roscoe Benton, joined by Desi Benton, claims entitlement to a new trial, arguing the defense was unfairly prejudiced by prosecutorial misconduct throughout the trial. Desi Benton also contends there was insufficient evidence to sustain one of her bankruptcy fraud convictions. For the reasons that follow, we reject both arguments and affirm each defendant's judgment.

**I**

The Bentons resorted to bankruptcy protection when they were unable to keep up with their residential rent payments. In October 2006, the Bentons began renting a home at

5322 Jamestown Place in Grand Blanc, Michigan, from the owner, Paul Carey, for $1,100 per month. Carey had lived there for four years, but was transferred in his employment to Hawaii. Carey later moved to California. From there, he continued to collect rent payments from the Bentons. In 2008 or 2009, however, their payments became irregular. In late 2009, Carey took action in state court to evict the Bentons for nonpayment of rent. In a judgment dated December 3, 2009, the Bentons were found to owe $12,635 in past due rent and costs and, barring payment in full by December 14, 2009, they would be ordered to vacate the home.

In response, the Bentons petitioned for relief under Chapter 13 of the Bankruptcy Code. Their petition was filed on December 14, 2009, staying the impending eviction. The bankruptcy court approved the Bentons' Chapter 13 Plan on June 10, 2010. It required the Bentons to pay the bankruptcy trustee $1,834 per month over the course of sixty months. The trustee would then, among other things, pay the $1,100 monthly rental amount to Carey, plus $110 per month to make up the arrears.

Less than a month after confirmation of their bankruptcy plan, the Bentons applied for homeowner's insurance on the house they were continuing to rent from Paul Carey. The State Farm homeowner's insurance policy became effective July 16, 2010, affording coverage for replacement value of the home in the amount of $267,000 and personal property coverage in the amount of $200,250.

On May 16, 2011, the Grand Blanc house on Jamestown Place was severely damaged by fire. Within two months, State Farm had paid the Bentons $184,726 for damage to the dwelling and the policy limit of $200,250 for loss of personal property.[1] On August 8, 2011, the Bentons

---

[1] Carey remained the owner of the house, but he didn't learn of the house fire until February 2012, when an attorney for Grand Blanc Township contacted him and requested that he either repair the structure or tear it down.

used the insurance proceeds to purchase a house in Desi's name at 5260 Fairway Trail in Grand Blanc for $180,574 in cash.

Apparently, however, they did not use the insurance proceeds to make good on the payments owed to the bankruptcy trustee. On August 3, 2011, the trustee moved to dismiss the bankruptcy proceeding because the Bentons had not made required payments since May 27, 2011. The Bentons responded to the motion on August 12 by admitting their default on payments required by the plan. They explained that they'd been evicted from the Jamestown Place residence because the landlord had defaulted on his mortgage payments, triggering foreclosure proceedings which forced them to move. They assured the court that they would correct their delinquency within 60 days and amend their plan or convert their petition to one seeking relief under Chapter 7.

This initial response was followed on October 17, 2011, by the Bentons' request for conversion from Chapter 13 to Chapter 7. The request for conversion was premised on the Bentons' statement that (1) they had filed for Chapter 13 relief "in an attempt to save their house"; and (2) their attempt to purchase the house by land contract had failed because "Paul Carey never paid the mortgage company and their residence was foreclosed on." R. 109, Notice of Voluntary conversion, Page ID 3201. Both of these bankruptcy court filings were prepared by attorney Henry Sefcovic and the latter filing bears the electronic signatures of both Bentons.

As a consequence of these actions, the Bentons were indicted in the Eastern District of Michigan on four counts of bankruptcy fraud, in violation of 18 U.S.C. § 157(3), and one count of mail fraud, in violation of 18 U.S.C. § 1341. Specifically, counts one and two charged the Bentons with bankruptcy fraud for knowingly understating the value of their personal property in their Chapter 13 filings in order to defraud creditors. Count three charged them with falsely

representing that they were owners of the dwelling at 5322 Jamestown Place in Grand Blanc to obtain homeowner's insurance coverage and proceeds, causing State Farm to mail a check payable to them in the amount of $184,726.72. Counts four and five charged the Bentons with two more acts of bankruptcy fraud. Count four charged them with falsely representing in a bankruptcy filing that they were forced to move from their residence due to foreclosure proceedings, knowing the house and its contents had actually been destroyed by fire, for which they had received at least $373,426.72 in insurance payments. Count five charged them with falsely representing in a bankruptcy filing that they were making monthly rent payments of $550 at a time when they were living in a Grand Blanc house they had purchased with cash and were not actually making any rent payments.

A jury trial was conducted over the course of eight days in November 2014. The jury returned its verdict, finding both defendants not guilty of count one (understating the value of motor vehicles in bankruptcy filings); finding Desi not guilty and Roscoe guilty of count two (understating the value of personal property in bankruptcy filings); finding both defendants guilty of mail fraud (misrepresentation of home ownership to State Farm); and finding both defendants guilty of counts four and five (bankruptcy misrepresentations regarding the status of their habitation following the house fire). Defendants were sentenced on May 5, 2016. Roscoe Benton was sentenced to a prison term of 48 months on each convicted offense, to be served concurrently, and was ordered to pay restitution to State Farm in the amount of $400,088.72. Desi Benton was sentenced to a prison term of 24 months on each convicted offense, to be served concurrently. She too was ordered to pay restitution in the amount of $400,088.72. The court ordered the two defendants' prison sentences to be served consecutively to each other: Desi's sentence to be served first, and Roscoe's to commence upon Desi's release. The

staggering of the sentences was designed to allow one of the two defendants to remain in the family household caring for Roscoe Benton's infirm mother, who was living with them. Desi began serving her sentence in the custody of the Bureau of Prisons on June 2, 2016. Her estimated release date is April 19, 2018.

Each defendant appealed separately and the appeals have been consolidated for briefing and disposition. Both defendants contend they were denied a fair trial by virtue of prosecutorial misconduct during trial. Specifically, they contend the Assistant United States Attorney made repeated comments—unsupported by evidence—implying that defendants' scheme to commit bankruptcy fraud included plans to commit insurance fraud by arson. In addition, Desi Benton contends there was insufficient evidence that she made a false representation necessary to sustain her count four bankruptcy fraud conviction.

## II

### A.  Prosecutorial Misconduct

The indictment did not include any charges or even any allegation of insurance fraud by arson against either defendant. No evidence presented at trial touched on the cause of the Jamestown Place fire, much less that it was caused by arson. This, however, did not hinder counsel for the government, the Bentons contend, from repeatedly and gratuitously alluding during trial to "things could that could burn up in a house fire." The characterization appeared first in counsel's opening statement, was referred to in examining witnesses, and was reiterated in closing arguments. These references are said to have been part of a deliberate scheme to plant the seed in the jurors' minds that the house fire had been started intentionally. The Bentons contend this prosecutorial misconduct prejudiced the defense and denied them a fair trial.

To prevail on a claim of prosecutorial misconduct, it is not enough for the Bentons to show that the prosecutor's comments were improper; they must establish that the comments so infected the trial with unfairness as to make the resulting conviction a denial of due process. *Wogenstahl v. Mitchell*, 668 F.3d 307, 327–28 (6th Cir. 2012). If the comments were improper, we then consider whether they were so flagrant as to result in such fundamental unfairness as to warrant reversal. *United States v. Lawrence*, 735 F.3d 385, 431–32 (6th Cir. 2013). Four factors guide our determination of flagrancy: "'(1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong.'" *Id.* at 432 (quoting *United States v. Carson*, 560 F.3d 566, 574 (2009)). Ordinarily, a claim of prosecutorial misconduct is reviewed de novo, but where, as the Bentons here concede, no objection was made during trial, the claim is reviewed for plain error. *Id.*

We may grant relief under plain-error review only if four requirements are met: (1) there must be a legal error; (2) the error must be clear; (3) the error must have affected the appellant's substantial rights; and (4) the error must have seriously affected the fairness, integrity, or public reputation of the proceedings. *Lawrence*, 735 F.3d at 401. "Meeting all four prongs is difficult, 'as it should be.'" *Puckett v. United States*, 556 U.S. 129, 135 (2009) (quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 83 n. 9 (2004)). A conviction should be reversed under plain-error review only in exceptional circumstances, such that the trial judge would be deemed derelict in having countenanced the unobjected-to misconduct. *United States v. Boyd*, 640 F.3d 657, 669 (6th Cir. 2011).

Applying the above standards, we find that the Bentons' prosecutorial misconduct claim comes up woefully short. Counts one and two charged the Bentons with misrepresenting the value of their personal property holdings when they filed for relief from their indebtedness in Chapter 13 bankruptcy. In explaining this charge to the jury during his opening statement, counsel for the government stated as follows:

> Schedule B, the Bentons declared their personal property. Now, lots of categories of personal property. Personal property means anything except your house and land. One of the categories is vehicles. The Bentons said they had a Yukon which they said was worth $2,500. And they said they had a Trailblazer that was worth a $1,000. And then also in the same schedule, they said they had household goods, et cetera, worth a total of $1,750. Now, that includes their clothing, their lawnmower, everything in their house. Basically, everything *that could burn up in a fire*, they said, was worth $1,750.

R. 99, Trial Tr. Vol. 2, Page ID 2087 (emphasis added). Just a year after the bankruptcy court had approved the Bentons' plan, counsel continued, the house they were renting and its contents were destroyed by fire. Following the house fire, counsel explained that the Bentons submitted an insurance claim for damage to their household goods:

> And that claim was that those goods were worth $277,000 in round numbers. Now, they had told the bankruptcy court that their household goods were worth $1,750. They tell State Farm, it was on the order of two hundred times that money.

*Id.*, Page ID 2090. Thus, counsel's characterization of personal property in the household goods category as "everything that could burn up in a fire," far from being "improper," appears to have been entirely appropriate, given the facts of the case. For it was the Bentons' insurance claim that they'd lost nearly $277,000 worth of personal property in the house fire (a claim that was satisfied by State Farm up to the policy limit of $200,250) that strongly impugned the accuracy

of their bankruptcy filing estimate just over a year earlier that they owned only $1,750 worth of personal property.[2]

Counsel repeated this characterization in his questioning of the Bentons' bankruptcy lawyer, Melissa DiGiamberdine, regarding the Bentons' Schedule B listing of their personal property holdings. To distinguish items of personal property properly included in the listing (such as household goods) from items of personal property properly omitted (like money held in bank accounts not maintained at the residence), counsel referred to the latter as "not things that could burn up." *Id.*, Page ID 2217. This characterization was not strictly necessary, but neither was it improper. Given that counsel had used the characterization, appropriately and without objection, in his opening statement, it was a sensible way of distinguishing between types of personal property in eliciting clear testimony from the Bentons' attorney.

Granted, counsel's use of the characterization four times during closing arguments was a bit much. R. 104, Trial Tr. Vol. 7, Page ID 2873–74, 2887. Yet, no objection was made. We can hardly hold this use of a shorthand label that had become a matter of convention in the trial was so flagrantly improper as to warrant a finding that the trial judge was derelict in failing to strike the references.

But the Bentons insist it's not that simple. In addition to the "everything that could burn up" comments, they point to other references tending to show a pattern, a deliberate effort to improperly influence the jury. Early in his opening statement, they contend, counsel for the government used a gratuitous illustration to subtly inject the notion of arson into the jurors'

---

[2] The Bentons' claim for personal property lost in the fire was supported by a 56-page spreadsheet detailing their extensive possessions, *see* R. 101, Trial Tr. Vol. 4, Page ID 2423–29, which stood in marked contrast to the personal property listing filed in the bankruptcy court.

thinking.  In relation to the count three mail fraud charge, counsel used the illustration to explain the concept of an "insurable interest":

> Agent Jones may think I'm a pretty reckless driver and she may think that the chances are excellent that in the next year or two, Haviland [i.e., Assistant U.S. Attorney Robert Haviland] is going to be driving so badly that he is going to crash his car.  So she might think, well, gee, why don't I just take out insurance on Haviland's car and when he does the inevitable and crashes it, I will collect the money.
>
> Well, you know that it doesn't work that way.  She cannot take out insurance on my car because she has no insurable interest in my car.  If I crash my car, I lose and in order to avoid that risk, I am required to get insurance on my car.
>
> In exactly the same way, if -- if some of you perhaps know a neighbor who is a reckless smoker, sooner or later that person is going to burn their house down.  You cannot take out insurance on their house and hope that they are going to burn the house down.  Because you don't have any insurable interest in their house.  If their house burns down, you haven't lost anything.
>
> That's the concept of insurable interest.  You can't get insurance on somebody else's property.

R. 99, Trial Tr. Vol. 2, Page ID 2084.  The Bentons concede the illustration was "plainly pertinent" to explain the concept of insurable interest in relation to the mail fraud charge, but suggest the choice of the illustration was not merely "adversarial rhetoric."

Without meaning to question government counsel's "morals or honesty," they point to the government's post-verdict objection to the original presentence report.  The government suggested the base offense level for both defendants should be increased because a preponderance of the evidence showed the fire was deliberately set for the purpose of obtaining insurance benefits.  Though they acknowledge that the objection was later withdrawn, the Bentons imply that the objection smacks of a purpose to suggest suspicion of arson during the earlier trial proceedings.

We remain unpersuaded.  The Bentons' suspicions about a nefarious scheme aside, the fact remains that the comments now complained of did not have sufficient potential to mislead the jury or prejudice the defense to even prompt an objection from either of their attorneys during trial.  This is likely due to the fact that each of the questioned comments, as the Bentons concede, had a legitimate purpose in the trial.  Even if it was not strictly necessary for the prosecution to use the characterizations it did, the comments were not clearly improper.  Nor have the Bentons shown that their substantial rights were adversely affected or that the fairness of the trial was seriously undermined.  In sum, this case does not present the exceptional circumstances that warrant relief under plain-error review.

**B.  Sufficiency of Count Four Evidence Against Desi Benton**

At the close of the proofs, Desi Benton moved for judgment of acquittal on the count four bankruptcy fraud charge against her.  The count four charge is based on the Bentons' August 12, 2011, bankruptcy court filing.  In that filing, the Bentons falsely attributed their default in making required payments to having been evicted from the Jamestown Place house due to foreclosure, without mentioning that the house had been destroyed by fire two months earlier. Desi Benton maintained there was no evidence of her involvement in that particular misrepresentation:  she did not sign the document prepared by the Bentons' attorney, and the evidence showed the information in the document was provided exclusively by Roscoe Benton. The district court called this "a closer question"—i.e., closer than the question posed by Roscoe Benton's motion—but denied Desi's motion as well.

We review the denial of a motion for judgment of acquittal de novo, but we must consider the evidence in the light most favorable to the prosecution. *United States v. Cunningham*, 679 F.3d 355, 370 (6th Cir. 2012).  We may not reweigh the evidence, reevaluate

the credibility of witnesses, or substitute our judgment for that of the jury. *Id.* The conviction must be upheld if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This standard is so demanding that a defendant who challenges the sufficiency of the evidence is said to face "a nearly insurmountable hurdle." *Davis v. Lafler*, 658 F.3d 525, 534 (6th Cir. 2011) (en banc) (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

In denying the motion from the bench, the district court recited the elements of the offense provided in the jury instructions:

> And those elements include the following: That the defendant knowingly participated in, devised or intended to devise a scheme to defraud. Second, that the defendant knowingly made or caused a materially false or fraudulent representation to be made in relation to a bankruptcy proceeding. Third, that the defendant made or caused to be made such materially false or fraudulent representation for purposes of executing or concealing a scheme to defraud. Fourth, that the defendant acted with intent to defraud. Those are the elements that need to be proven to prove a violation of bankruptcy fraud.

R. 104, Trial Tr. Vol. 7, Page ID 2825–26; R. 35, Jury Instr. 2.02, Page ID 128. The court acknowledged Desi Benton's argument based on the second element that there was no evidence that she "knowingly made or caused" the materially false or fraudulent representation contained in the August 12, 2011 filing. But the court recognized that the August 12 filing was part of a larger scheme to defraud in which, the evidence showed, "the Bentons were working together, that they were cooperating with one another as a team." R. 104, Trial Tr. Vol. 7, Page ID 2826–27.

Desi Benton contends the district court erred. She insists the misrepresentation charged in count four must be found within the four corners of the August 12 filing. She does not dispute the notion that the filing contains a materially false explanation, but contends the evidence showed that the contents of the document were supplied exclusively by her husband. This

argument is based on a plausible reading of count four and the record evidence. But the argument neglects the standard of review the district court was obliged to apply. That is, the argument is not so compelling as to warrant the finding that no reasonable juror could have found her guilty.

We note that the August 12 filing, on its face, purports to be made on behalf of "the Debtor, Roscoe *and* Desi Benton, by and through their attorney." R. 109, Debtor's Response, Page ID 3200. This, in itself, is some evidence of Desi Benton's involvement that the jury was obliged to consider. The facts that Desi did not sign the document and did not physically participate in the meeting between Roscoe and their attorney do not compel a finding that she did not participate in the misrepresentation. There was, after all, no evidence that Desi disagreed with or disavowed the contents of the August 12 filing.

Among other things suggesting Desi Benton's involvement, as the district court noted, was the Bentons' October 17, 2011 bankruptcy court filing, the Notice of Voluntary Conversion. This document was signed (electronically) by both Bentons. It complemented the August 12 filing by implementing its stated purpose and contains statements that could also be found to be misrepresentations or material omissions. The court reasoned:

> [A] reasonable juror could conclude that although Ms. Benton was not, according to Mr. Sefcovic, a participant in the meetings that occurred prior to this debtor's motion, this Debtor's Response to a Motion to Dismiss, a reasonable juror could conclude that Ms. Benton was nevertheless aware of the scheme to present false information to the bankruptcy court.

R. 104, Trial Tr. Vol. 7, Page ID 2828.

Desi Benton correctly argues that mere awareness of the scheme is insufficient. Yet, a fair reading of the trial court's bench ruling discloses that it did not rely solely on evidence of Desi's awareness. Rather, the court effectively accepted the government's position that Desi's

involvement in the October 17 filing evidenced her awareness *and* ratification of the August 12 filing.  *See* R. 103, Trial Tr. Vol. 6, Page ID 2811–12.

In response to a sufficiency-of-the-evidence challenge, the government "may meet its burden through circumstantial evidence alone, and such evidence need not exclude every possible hypothesis except that of guilt."  *United States v. Parkes*, 668 F.3d 295, 302 (6th Cir. 2012) (quoting *United States v. Jackson*, 55 F.3d 1219, 1225 (6th Cir. 1995)).  In an eight-day trial that witnessed abundant evidence of Roscoe's and Desi's cooperation in an ongoing scheme to defraud—including collaborative acts in furtherance of the scheme immediately before and after the August 12 filing—there were ample grounds, as the district court noted, for the jury to reasonably infer that Desi participated in the misrepresentation.[3]

Accordingly, on de novo review, we find that Desi Benton has failed to overcome her "nearly insurmountable hurdle."  We find no error in the district court's denial of the motion for judgment of acquittal.

### III

Having thus duly considered each of appellants' challenges and finding no error, we **AFFIRM** the judgments.

---

[3] Desi Benton notes that, insofar as the district court, at one point, characterized the material misrepresentation as a "material omission," R. 104, Trial Tr. Vol. 7, Page ID 2827, there is an open question whether mere "omissions" or "concealment"—in contrast to affirmative misrepresentations—can make out a bankruptcy fraud violation under 18 U.S.C. § 157(3).  This is a question we need not address.  As Desi Benton concedes, the jury instructions, without objection from the parties, allowed the jury to find the "false or fraudulent representation" element satisfied by evidence of "half-truths and the knowing concealment of material facts." R. 35, Jury Instr. 2.02, Page ID 129.